**FILED**
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.

★ JUL 3 1 2009 ★

BROOKLYN OFFICE

D F

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

--------------------------------------------------------------------X

MIRIAM TORIBIO,

                  Plaintiff,

      -against-

MICHAEL J. ASTRUE, Commissioner
of Social Security,

                  Defendant.

--------------------------------------------------------------------X

**MEMORANDUM & ORDER**

**06-CV-6532 (NGG)**

NICHOLAS G. GARAUFIS, United States District Judge.

      Plaintiff Miriam Toribio ("Plaintiff") brings this action pursuant to 42 U.S.C. § 405(g) of the Social Security Act ("SSA"), challenging the final determination of Defendant Commissioner of Social Security Michael J. Astrue ("Commissioner" or "Defendant") to deny her Social Security Disability Insurance Benefits ("SSDI") and Supplemental Security Income ("SSI") under Title II of the Social Security Act. The parties have cross-moved for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure. As set forth below, the court concludes that the Administrative Law Judge failed to adequately develop the record and to provide the required reasons for not affording the opinion of Plaintiff's treating sources controlling weight. Accordingly, Defendant's Motion is denied and Plaintiff's Motion is granted to the extent that the decision of the ALJ is vacated and remanded for further administrative proceedings.

# I.    BACKGROUND

## A.    Procedural History

Plaintiff filed a pro se application for SSDI and SSI on June 21, 2004, claiming that she was disabled due to carpel tunnel syndrome in both hands and depression. (Transcript of the Administrative Record ("Tr.") 23, 39 58, 178-79.) Plaintiff stated in her application that she had been unable to work since January 18, 2004, when her daughter was killed in a motor vehicle accident. On November 10, 2004, Plaintiff's application was denied. (Id. 24-29.) Plaintiff requested a hearing, which was held on July 10, 2006 before the Administrative Law Judge ("ALJ") Dennis O'Leary. (Id. at 15-22, 30-32, 37-43.) Plaintiff appeared pro se via videoconference in the fifteen-minute hearing. (See id. at 173-80.) The ALJ issued a decision denying Plaintiff's claim of disability, which became the final decision of the Commissioner. (Id. at 6-9, 15-22.) Plaintiff, now represented by counsel, commenced this action seeking reversal and a remand for additional proceedings. (Id. at 6-9.)

## B.    Plaintiff's Personal and Employment History

Plaintiff was born on July 28, 1949 in the Dominican Republic, where she received an eighth-grade education. (Id. at 174.) Plaintiff moved to the United States in 1975. (Id.) From 1989 to 2004, Plaintiff worked as a cleaner. (Id. at 53, 174.) Plaintiff discontinued this line of work around January 18, 2004, the date of her daughter's death. (Id. at 53, 79, 95, 128.) In 2004 and 2005, Plaintiff was self-employed as a childcare provider. (Id. at 17, 174-175.) According to Plaintiff, she earned $11,147 in 2004 and $7,389 in 2005. (Id. at 47-51, 174-175.) Plaintiff testified that she discontinued this work as a result of the scheduling of two or three more operations for tendonitis. (Id. at 174-75.) Plaintiff testified that she was currently unemployed and without income. (Id.)

## C. Plaintiff's Medical History

Plaintiff's disability application indicated disabling impairments of carpal tunnel syndrome in both hands and depression. (Id. at 23.) Plaintiff's medical record consists of reports from a treating physician and treating psychiatrist – although, as discussed below, the record is not clear as to who provided psychotherapy and a psychiatric consultation to Plaintiff – as well as reports from a state agency physician, state agency psychiatrist, and a non-examining psychological consultant.

### 1. Physical Evaluations

### a. Treating Physician

Plaintiff was treated by Dr. Carlos Heredia in 2003 and 2004 for carpal tunnel syndrome, tendinitis, arthralgia, osteoarthritis of the spine, pain in the right hand and wrist, and pain in the right thigh. (Id. at 91-100, 100.) In February 2004, Plaintiff underwent right carpal tunnel release surgery, which was performed by Dr. Roger Ignatius. (Id. at 72-75.) According to Dr. Ignatius's medical notes, Plaintiff had previously undergone left carpal tunnel release surgery in 2002. (Id. at 74.) Additionally, Plaintiff was treated by Dr. Kashmira Patel in April 2003 for pain in her right hand. (Id. at 99.)

In 2004, Plaintiff received Magnetic Resonance Imaging ("MRI") of her lumbar and cervical spines and an x-ray of her right foot. (Id. at 84-88.) The x-ray of Plaintiff's right foot revealed a "calcaneal spur." (Id. at 88.) The MRIs of Plaintiff's lumbar and cervical spines revealed uncovering of disks, disk protrusion, disk bulge, osteoarthritis, and mild stenosis. (Id. at 84-87.) Overall, Plaintiff's condition was assessed to be "neurologically stable" with treatment including pain killers, physical therapy, and a follow-up visit. (Id. at 84.)

In January 2005, Dr. Heredia referred Plaintiff to Dr. Russell S. Golkow for MRIs of her right knee and left shoulder. (Id. at 153-155.) The MRI of the right knee revealed "severe maceration and surface irregularity or fibrillation of the surface of the posterior horn of the medial meniscus of the right knee; mild-to-moderate degenerative joint disease; and almost complete loss of cartilage from the lateral retropatellar facet consistent with moderately advanced chondromalacia patella." (Id. at 153-154.) The MRI of Plaintiff's left shoulder revealed "moderately pronounced subacromial stenosis and rotator cuff impingement; full thickness complete tear of the supraspinatus tendon with three centimeters of retraction; and joint capsular fluid communicat[ing] across the rotator cuff, defecting into the subacromial bursa." (Id. at 155.)

In December 2005, Plaintiff was again referred to Dr. Golkow for an MRI of the lumbar spine. (Id. at 156-157.) The MRI revealed "first degree L5-S1 spondylolisthesis likely on the basis of moderately advanced bilateral L5-S1 facet joint degenerative joint disease. This combination of findings results in moderate circumferential spinal stenosis at this level." (Id.) In addition, there was indication of mild to moderate disc herniation and indication of a bulging annulus at L4-5. (Id. at 157.)

Dr. Heredia referred Plaintiff to Dr. Richard Dauhajre for an electrodiagnostic examination for lower back pain. (Id. at 158-159.) The undated results were faxed to the state agency on July 10, 2006.[1] (Id.) According to the report, Plaintiff's electromyogram and nerve condition study were abnormal, with evidence of "chronic left lower lumbar radiculopathy with the L4 and L5 nerve roots being the most severely involved." (Id. at 158-159.) Another undated letter faxed to the state agency on July 10, 2006 from Dr. Heredia reported that Plaintiff was

---

[1] It is most likely that the exam was performed in December 2005, because the report states that Plaintiff was 56 years and five months old at the time of the examination.

being treated for "chronic debilitating conditions that make her totally incapacitated." (Id. at 160.) Dr. Heredia diagnosed Plaintiff with "herniated lumbar disc, lumbar radiculitis, osteoarthritis of the left shoulder, and tendon tear in the left shoulder." (Id.) He prescribed anti-inflammatory medication and physical therapy as treatment. (Id.)

### b. Consulting Physician

On August 11, 2004, Plaintiff was examined by Dr. Kyung Seo, a state agency orthopedist. (Id. at 81-82.) Dr. Seo reported that Plaintiff complained of numbness and weakness of the right hand, pain in the right wrist with difficulty holding, lifting, and carrying heavy objects; and occasional locking of the left fourth and fifth fingers. (Id.) Dr. Seo observed that Plaintiff entered the examination room normally; Plaintiff exhibited no difficulty in standing up or getting on and off the examination table; and Plaintiff exhibited normal fine motor activity of both hands, with gripping strength in the right hand graded as 4/5 and the left hand graded as 5/5. (Id.) Additionally, Plaintiff's back examination revealed normal curvature and no spasms of the paraspinal muscles. (Id. at 82.) While Plaintiff's lower extremities exhibited no muscular atrophy or debilitated strength, Plaintiff experienced pain in conducting the straight leg raising test. (Id.) According to the report, Plaintiff encountered difficulty in performing toe-to-toe and heel-to-heel walking, complaining of pain in her right heel. (Id.) Dr. Seo indicated "myofascial pain of the lower back, probably degenerative disk disease; status post bilateral carpal tunnel release; and status post injection therapy for the right heel spur." (Id.) His "medical assessment" indicated that Plaintiff was "slightly limited in sitting, standing, bending, lifting, and carrying heavy objects" due to the pain in her right wrist, right hand, and lower back along with the heel spur and arthralgia of both knees. (Id.)

5

The Government issued a "Failure to Cooperate" form to Plaintiff on November 8, 2004, indicating that Plaintiff was not compliant with instructions for acquiring additional medical evidence. (Id. at 20, 152.) On July 7, 2006, Jacqueline Perez, Plaintiff's social worker, reported that Plaintiff was planning to undergo a surgical procedure for her tendonitis on July 24, 2006. (Id. at 162.)

### 2.    Psychological Evaluations

#### a.    Treating Sources

Between August 2004 and September 2004, Plaintiff was treated at Bleuler Psychotherapy Center for depression. A report signed on September 27, 2004 by Dr. P. Formikainis, a physician[2] at Bleuler, indicated that Plaintiff underwent five psychotherapy sessions and a psychiatric consultation during this period.[3] (Id. at 129.) The report, however, does not indicate which psychiatrist and/or psychotherapist treated Plaintiff on her six visits to Bleuler, nor does it contain treatment notes for the individual sessions. (Id. at 127-133.)

The report indicated that Plaintiff was diagnosed with a bereavement condition and depressive disorder. (Id. at 127.) It was noted that Plaintiff's initial "comprehensive mental status examination" indicated that Plaintiff stopped working due to "depression, lack of motivation, and inability to go on with her life as before" her daughter's death. (Id. at 128.) Plaintiff's current symptoms included grief, crying spells, depression, anxiety, weight gain, difficulty falling asleep, and frequent awakening. (Id. at 127.) It was noted that Plaintiff still exhibited mood and affect of bereavement condition and depression, as she continued to wear mourning clothes eight months after her daughter's death. (Id. at 129.) Plaintiff was noted as

---

[2] Dr. Formikainis's professional title is illegible.
[3] Plaintiff reported in her list of treating sources that she was treated by Dr. Siquiatras. (Tr. 65.) The disability determination form sent by the state agency to the Bleuler Medical Center was addressed to Dr. Lette Santiago, but it was returned by Dr. Formikainis, who signed the completed report. (Id. at 127-133.)

being cooperative, possessing a good attitude toward treatment, and articulate and able to express her desire to live to be able to raise her granddaughter. (Id.) Plaintiff's "current functional assessment" indicated that in a typical day she cared for her granddaughter, maintained her household, and went to appointments. (Id. at 130.) Additionally, the report indicated that Plaintiff could function socially in a work setting but had no motivation to work, Plaintiff possessed a limited capacity to follow a work schedule due to depression, Plaintiff "had no desire to leave her home unless it was essential," and Plaintiff had "difficulty dealing with changes in schedules." (Id. at 130-132.) Finally, it was indicated that the physician who completed the report could not provide a medical opinion regarding Plaintiff's ability to do work-related activities. (Id. at 132.)

### b. Consulting Psychiatric Sources

On August 2, 2004, Plaintiff was examined by state agency psychiatrist Dr. Richard King. (Id. at 79-80.) Dr. King reported that Plaintiff arrived at the clinic alone by subway, Plaintiff had no history of psychiatric difficulties or substance dependency, and Plaintiff felt anxious and depressed since her daughter's death. (Id.) Dr. King noted that Plaintiff performed routine activities of daily living, performed household chores, shopped, went to Church, read the Bible, and took her granddaughter to the park. (Id.) According to his report, Plaintiff established a good rapport, had a mood that was euthymic with no signs of significant depression or anxiousness, and did not suffer from hallucinations, delusions, suicidal ideations, or paranoid trends. (Id.) Dr. King reported that Plaintiff was able to function intellectually on an average level with fair insight and judgment and adequate attention and concentration. (Id.) Dr. King concluded that Plaintiff had both a satisfactory ability to understand, carry out, and remember instructions and a satisfactory ability to respond appropriately to supervision and the work

environment. (Id.) Dr. King diagnosed Plaintiff with a mild degree of grief disorder, noting that Plaintiff "might benefit from psychiatric treatment." (Id.)

In addition to Dr. King's report, the record contains an independent evaluation from Y. Burstein, Ph.D., a non-examining Disability Determination Services psychological consultant. (Id. at 134.) Dr. Burstein completed Plaintiff's Mental Residual Functional Assessment, diagnosing Plaintiff with "depressive disorder relating to bereavement condition, a condition that was usually temporary." (Id. at 136.) Dr. Burstein noted that Plaintiff was only limited in two out of twenty of the assessed areas, being moderately limited in her ability to understand, remember, and carry out detailed instructions. (Id. at 134-136.) Dr. Burstein reported that Plaintiff suffered no thought disorder, her cognitive skills were intact, and her communication and interpersonal skills were adequate. (Id. at 136.) Additionally, Dr. Burstein reported that Plaintiff was able to follow directions, able to complete tasks, and able to relate to others and maintain acceptable pace and adapt to simple changes. (Id.)

### D.     Plaintiff's Testimony at the Hearing

At the hearing on July 10, 2006, Plaintiff testified that she stopped working as a childcare provider due to complications with carpal tunnel syndrome and her two upcoming surgeries. (Id. at 175.) Plaintiff informed the ALJ that she experienced "new problems" that were not indicated on her disability application. (Id. at 175-176.) Plaintiff testified to having developed a problem with her back and knees, which she believed to be a hernia or pinched nerves. (Id.) Plaintiff reported that in consequence of this new condition, she experienced significant pain, for which she received physical therapy. (Id.) Additionally, Plaintiff testified to suffering from a "different" problem with her hand, as it would get "stuck," significantly limiting her use of it. (Id. at 176.) Plaintiff reported receiving injections and physical therapy for her hand, but the

8

treatment was "no good." (Id.) Plaintiff informed the ALJ that she would send him forms regarding the "new problems" in her hand, back, and knees, when she received them from her doctor. (Id.) During the hearing, Plaintiff faxed forms to the ALJ, which are indicated in the record index as medical reports from Dr. Golkow, Dr. Dauhajre, and Dr. Heredia. (Id. at 2, 177.)

Plaintiff also testified briefly about her mental impairments and prescribed medications. Plaintiff testified that she took "Lexapro, 20 milligrams" for depression in addition to attending therapy every week. (Id. at 178-179.) Her prescribed medications included Gabapentin, 600 milligrams nightly; Vytorin, 10 milligrams daily, for cholesterol; Molbit, 7.5 milligrams daily, for pain; Ambien, 10 milligrams, for sleeping; aspirin, taken once daily; hydrochloride with Tritozide, 12.5 milligrams, for high blood pressure; and Prilosec, 20 milligrams, for stomach problems. (Id.)

Finally, Plaintiff testified about her activities of daily living, reporting that she cared for her eighty-nine year old mother and three-year-old grandchild, although she was not paid for these tasks. (Id. at 177-78.) While Plaintiff reported doing "everything" for them, she testified that she endured pain while performing both household and daily living tasks. Plaintiff reported receiving much assistance from her sister and others in conducting her daily tasks. (Id. at 178.)

## II.   STANDARD OF REVIEW

The role of the district court in reviewing the Commissioner's decision is to determine whether such decision is supported by substantial evidence in the record. Hartnett v. Apfel, 21 F. Supp. 2d 217, 221 (E.D.N.Y 1998). A district court may dismiss the Commissioner's decision only where the factual findings are not in compliance with the substantial evidence or where the decision is based on a legal error. See 42 U.S.C. §§ 405(g); Shaw v. Chater, 221 F.3d 126, 131 (2d Cir. 2000). Substantial evidence is "such relevant evidence as a reasonable mind might

accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consolidated Edison Co. v. NLRB, 205 U.S. 197, 229 (1938)). It requires "more than a mere scintilla" of evidence. Id. It is not the duty of the district court to decide de novo the disability status of a claimant or to "answer in the first instance the inquiries posed by the five-step analysis set out in the SSA regulations." Melville v. Apfel, 198 F.3d 45, 51 (2d Cir. 1999) (citations omitted). Accordingly, the district court may not affirm the Commissioner's decision on grounds that differ from those considered by the Agency. Id. Where the administrative record contains gaps or where an improper legal standard has been applied, the court should remand the case to the Commissioner for further development. Hartnett, 21 F. Supp. 2d at 221.

## III.    DISABILITY STANDARD

An individual is disabled for purposes of SSI and SSDI if she suffers from an "inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.1505, 416.905; 42 U.S.C. § 423(d)(1)(A). The physical or mental impairment must be severe enough to preclude the individual from engaging in previous types of work and from engaging in any other type of substantial gainful work that exists in the national economy. Berry v. Schweiker, 675 F.2d 464, 466-7 (2d Cir. 1982) (citing 42 U.S.C §§ 423(d)(2)(A), 1382c(a)(3)(B)). The claimant bears the initial burden to show that her impairment precludes her from engaging in prior forms of substantial gainful work, while the Commissioner has the burden of proving that the claimant has the ability to perform other types of substantial gainful work that exist in the economy. Id. at 467.

The ALJ uses a five-step sequential analysis in determining whether an applicant is disabled as defined by the Social Security Act. Melville, 198 F.3d at 51; 20 C.F.R. §§ 404.1520(a), 416.920(a). If, at any step, there is sufficient evidence to establish that the claimant is not disabled, the analysis is terminated and the ALJ does not proceed to the next step. Id. First, the Commissioner determines whether the claimant has engaged in substantial gainful activity ("SGA"). Second, if the claimant is not performing SGA, the Commissioner must determine whether the claimant suffers from a severe impairment that significantly limits her physical or mental ability to do basic work activities. If such impairment is not found to be present, the claimant is denied benefits. Third, if the claimant is found to suffer from a severe impairment as specified in step two, the impairment is compared to those listed in Appendix 1 of the regulations. If the claimant's impairment is comparable to one listed in the Appendix, she is considered disabled and her request for benefits is granted. Fourth, if the impairment is not equivalent to one listed in the Appendix, the claimant must show that she is not capable of performing her past relevant work. In the event that the claimant is unable to make such a showing, her claim is denied. Finally, if the claimant has shown that she is not capable of performing her past relevant work, the burden shifts to the Commissioner to demonstrate that the claimant retains a residual functional capacity ("RFC") to perform other forms of substantial gainful work activity existing in the national economy. See Melville, 198 F.3d at 51.

The ALJ has an affirmative duty to develop a claimant's record, regardless of whether the claimant is represented by counsel. Shaw, 221 F.3d at 131. In the case of a pro se claimant, the ALJ bears a heightened duty to "scrupulously and conscientiously probe into, inquire of, and explore for all the relevant facts." Peed v. Sullivan, 778 F. Supp. 1241, 1245 (E.D.N.Y. 1991). In addition, the ALJ must give controlling weight to the opinion of the claimant's treating

physician when it is supported by evidence that is consistent with other substantial evidence in the record. Lamar v. Barnhart, 373 F. Supp. 2d 169, 175 (2d Cir. 2005) (quoting Rivera v. Sullivan, 771 F. Supp. 1339, 1351 (S.D.N.Y.1991)). Where the ALJ has failed in his or her affirmative duty to develop the record, or where he or she has applied an improper legal standard, courts have remanded the case to the Commissioner for further development. Id.; see Rosa v. Callahan, 168 F.3d 72, 83 (2d Cir. 1999).

## IV.    THE ALJ's DECISION

The ALJ found that Plaintiff was not disabled as defined by the SSA. At the first step, the ALJ noted that "for the period of 2004 through 2005, [Plaintiff's] work activity is found to constitute substantial gainful activity." This finding was based on Plaintiff reported earnings of $11,147 in 2004 and $7,389 in 2005. (Tr. 17, 46-47, 50, 174-5.) Nonetheless, the ALJ did not make an explicit finding that Plaintiff was not disabled for this reason, and he proceeded to step two of the analysis.

At step two, the ALJ found that Plaintiff suffered from the severe impairments of "carpal tunnel syndrome and back, knee, and shoulder pain." (Id. at 17-19.) While the ALJ noted findings of "severe" physical impairments, he also found that the evidence established that Plaintiff "retains the capacity to function adequately to perform many basic activities associated with work." (Id. at 20.) The ALJ relied on the findings of Dr. King, state agency psychiatrist, in reporting that there was not substantial evidence to support a finding of any impairment involving depression that had more than a "slight or minimal effect on Plaintiff's ability to perform." (Id. at 18-19.) While the ALJ did not explain his reasoning for allotting Dr. King's opinion greater weight than that of Dr. Formikainis, a physician of the clinic that treated Plaintiff, the ALJ reported that Dr. King's evaluation seemed to satisfy the applicable test for

determining whether a claimant's mental impairment significantly limited her ability to perform in work activity. (Id. at 19.) The ALJ concluded that Dr. King's evaluation established that Plaintiff could function adequately in a work environment, her mental impairment was temporary, and she only suffered from a slight mental impairment, not substantial enough to render her disabled. (Id.) Based on these findings, the ALJ concluded that Plaintiff's depression was not severe enough to the degree required by Appendix 1. (Id. at 18-19.)

In step three, relying on the orthopedic examination performed by the state agency physician Dr. Seo, the ALJ reached the conclusion that Plaintiff did not suffer an impairment equal to the listed impairments in Appendix 1. (Id. at 19.) Dr. Seo reported that Plaintiff had normal fine motor activity in both hands and that Plaintiff's back, leg, and hand pain created only slight limitations in Plaintiff's daily activities. (Id.) In addition to Dr. Seo's report, the ALJ relied significantly on Plaintiff's testimony regarding her household duties and caretaking of her mother and granddaughter to establish that Plaintiff was capable of engaging in more rigorous activity than she claimed at the hearing. (Id.) The ALJ found that the evidence failed to support that Plaintiff's carpal tunnel and back pain included major dysfunctions that rendered Plaintiff incapable of "ambulating effectively" or "performing fine gross movements with effect," as required by the listing in Appendix 1.02. (Id.) Further, the ALJ noted that there was no evidence that Plaintiff's spine disorders met the requirements of listing 1.04. (Id.) The ALJ reported that the objective medical records revealed some orthopedic limitations, but not to the extent claimed by Plaintiff. (Id. at 20.)

The ALJ reported that based on the record and Plaintiff's testimony, it could be established that Plaintiff exhibited the RFC to perform a "full range of medium work." (Id. at 19-20.) The ALJ acknowledged the skill and expertise of the state agency physicians and

endorsed their findings as consistent with the determination that Plaintiff was "capable of significant work-related activities." (Id. at 17-22.) The ALJ explained that he assigned little weight to Plaintiff's treating physician Dr. Heredia as a result of Dr. Heredia's broad statement that Plaintiff was "totally incapacitated." (Id. at 21.) According to the ALJ's opinion, Dr. Seo's findings drastically differed from those of Dr. Heredia; however, Dr. Seo's findings were in accordance with the objective medical evidence. (Id.) The ALJ noted that Dr. Heredia's assessment of Plaintiff's ability to work was unsupported by the evidence and should be, accordingly, reserved for the Commissioner. (Id.) Based on these findings, the ALJ held that Plaintiff was not disabled as defined by the SSA and thereby denied her SSI and SSDI benefits. (Id. at 21-22.)

## V.    DISCUSSION

Plaintiff claims that the ALJ failed to satisfy his heightened duty to develop the record of a pro se claimant by failing to re-contact her treating sources for information relevant to her claim and by failing to allocate appropriate weight to her treating sources. The Commissioner claims that the decision was supported by substantial evidence. For the reasons below, the court concludes that remand is warranted.[4]

### A.    The ALJ's Failure To Develop The Record

Under the Social Security Regulations, the Commissioner has a duty to "develop [a claimant's] complete medical history for at least the 12 months preceding the month in which [the claimant] file[s] [her] application." 20 C.F.R. §§ 404.1512(d), 416.912(d). A complete medical history consists of "the records of [claimant's] medical sources(s) covering at least the

---

[4] Despite noting that Plaintiff engaged in substantial gainful activity at step one, the ALJ did not make an explicit determination that Plaintiff was not disabled for that reason, and he proceeded to step two of the analysis. The Commissioner does not contend that Plaintiff is not disabled based on step one. Accordingly, the court does not address whether Plaintiff engaged in substantial gainful activity. Connor v. Barnhart, No. 02 Civ. 2156 (DC), 2003 WL 21976404, at *6 n.7 (S.D.N.Y Aug. 18, 2003).

12 months proceeding the month in which [claimant] files her application. If...[the] disability began less than 12 months before [claimant] filed [her] application, [the Agency] will develop [her] complete medical history beginning with the month [she] say[s] disability began." Id. To uphold this duty, the Commissioner must "make every reasonable effort to help [claimant] get medical reports from [her] own medical sources." Id. Based on these regulations, the ALJ has an affirmative duty to develop a plaintiff's medical record. Pratts v. Chater, 94 F.3d 34, 35-39 (2d Cir. 1996).

Gaps in the administrative record warrant remand for further development of the record. Sobolewski v. Apfel, 985 F. Supp. 300, 314 (E.D.N.Y 1997); see Echevarria v. Secretary of Health & Hum. Servs., 685 F.2d 751, 755-56 (2d Cir. 1982) (finding that the plaintiff did not receive a "fair and adequate hearing" before the ALJ due to "gaps" in the record consisting of the ALJ's failure to inquire into the effect of plaintiff's impairment on his ability to work); see also Batista v. Chater, 972 F. Supp. 211, 217 (S.D.N.Y. 1997) ("A finding of gaps in the record or need for further development of the evidence is cause for remand"). Remand is especially appropriate where the court is "unable to fathom the ALJ's rationale in relation to the evidence in the record without further findings or clearer explanation for the decision." Pratt, 94 F.3d at 39; see also Butts v. Barnhart, 388 F.3d 377, 385 (2d Cir. 2004) (noting that "when further findings would so plainly help to assure the proper disposition of [the] claim, we believe that remand is particularly appropriate").

In this case, the ALJ failed to address significant gaps in Plaintiff's administrative record. First, the ALJ failed to contact the source that Plaintiff listed as her treating source at Bleuler Psychotherapy Center. (Tr. 65.) In an undated memo providing the contact information of Plaintiff's treating sources, Plaintiff provided the information for "Doctores Siquiatras" at

"Blyulia." Although the list contained spelling errors due to Plaintiff's limited knowledge of English, it provided correct contact information. (Id.) As part of his affirmative duty to develop the record, the ALJ should have contacted Dr. Siquiatras to inquire into Plaintiff's treatment at Bleuler. The record gives no indication that the ALJ sought such information.

The second notable gap is the ALJ's failure to ascertain the identity of Plaintiff's treating source at Bleuler. SSA regulations require an ALJ to evaluate all medical opinions and other relevant evidence received in the claimant's case record. 20 C.F.R. §§ 404.1527(b), 416.927(b). More weight is to be awarded to Plaintiff's treating sources. 20 C.F.R. § 404.1527(d)(2); see Schisler v. Sullivan, 3 F.3d 563, 568-569 (2d Cir. 1993).

Plaintiff's record includes only one report from her treating source regarding her mental impairment, a report for the New York State Office of Temporary and Disability Assistance Division of Disability Determinations for the period of August 18, 2004 to September 29, 2004. (Tr. 127-133.) According to the index to the court record and the footers of the report, the report was "from" Dr. Lette Santiago, a "physician" at Bleuler. (Id. at 2, 127-133.) The report was signed by a different doctor, however – Dr. Formikainis. (Id. at 133.) Although both Dr. Santiago and Dr. Formikainis were physicians at Bleuler, their relationships to Plaintiff were not indicated in the record. The ALJ should have inquired into their relationships with Plaintiff in order to determine which one, if any, actually treated Plaintiff. Without such information as to who treated Plaintiff, the ALJ could not provide appropriate weight to the treating source as the SSA regulations require. 20 C.F.R. § 404.1527(d); see Lamar, 373 F. Supp. 2d at 175.

In addition to failing to ascertain who treated Plaintiff at Bleuler, the ALJ did not indicate the professional status of Dr. Formikainis or Dr. Santiago. This court has held that while both psychologists and psychiatrists satisfy 20 C.F.R. § 404.1513(a)(1-5), qualifying as acceptable

16

medical sources, therapists do not. See Zervas v. Barnhart, No. 05-CV-2133 (FB), 2007 WL 1229312, at *4 (E.D.N.Y. Apr. 26, 2007) (finding that, where the record included reports from a social worker, rehabilitative expert, psychiatrist, and psychologist, only the social worker and rehabilitative expert were found to not be acceptable medical sources under § 404.1513(a)(1-5)). While the ALJ did not expressly state whether he considered the "physicians" from Bleuler to be psychologists, psychiatrists, or therapists, it is clear that Plaintiff saw a psychiatrist on at least one occasion. The record indicates that Plaintiff underwent five psychotherapy sessions at Bleuler from August 18, 2004 to September 29, 2004 and received a psychiatric consultation on September 27, 2004. (Tr. 129.) Plaintiff also testified that she took medication for depression, indicating that she had been treated by a psychiatrist. Under the ALJ's duty to complete Plaintiff's medical record and to "scrupulously and conscientiously probe into" the relevant facts of Plaintiff's case, the ALJ should have sought information from Plaintiff's treating psychiatric source and this should have been indicated in the record. Peed, 778 F. Supp. at 1245.

The third gap regards the ALJ's failure to inquire into the duration of Plaintiff's treatment at Bleuler. When Plaintiff testified before the ALJ in July 2006, she reported receiving ongoing therapy every week. (Id. at 178-9.) The report signed by Dr. Formikainis was issued in September of 2004, while Plaintiff testified before the ALJ in July 2006. (Id. at 127, 133, 173.) There is almost a two-year gap from the time the report was issued and the time Plaintiff testified. Further, the ALJ does not address this issue in his opinion, and the record does not give any indication that the ALJ ever sought such information. To satisfy his affirmative duty to seek all relevant information before deciding Plaintiff's case, the ALJ should have sought updated information regarding Plaintiff's treatment for depression.

The failure was further highlighted by the ALJ's failure to adequately question Plaintiff regarding the effect that her depression had on her ability to work. During Plaintiff's fifteen-minute hearing, the ALJ conducted a cursory inquiry into Plaintiff's depression after Plaintiff briefly mentioned that she took medication for depression. (Id. at 178-179.) The ALJ responded by asking Plaintiff two questions regarding her depression. (Id. at 179.) The ALJ asked Plaintiff to describe her problem with depression and he asked how it affected her. (Id.) After Plaintiff responded that she suffered from depression after her daughter's death and that her ongoing therapy helped her feel better, the ALJ immediately switched to addressing different issues. (Id.) The ALJ did not inquire into the degree to which Plaintiff's depression affected her ability to work, nor did he inquire into the extent to which Plaintiff was still being treated. This is a clear failure to develop Plaintiff's record.

The fourth gap regards the ALJ's failure to re-contact Plaintiff's treating physician, Dr. Heredia. The ALJ must request additional information from a treating physician whenever the attained information is inadequate for determining a plaintiff's disability status. 20 C.F.R § 404.1512(e). The ALJ should seek such information when a medical report contains a conflict or ambiguity that must be resolved, the report is missing necessary information, or the report does not seem to be based on medically acceptable clinical and diagnostic techniques. Id. § 404.1512(e)(1). When "an ALJ perceives inconsistencies in a treating physician's report, the ALJ bears an affirmative duty to seek out more information from the treating physician and to develop the administrative record accordingly," Hartnett, 21 F. Supp. 2d at 221, by making every reasonable effort to re-contact the treating source for clarification of the reasoning of the opinion. Taylor v. Astrue, No. 07-CV-3469, 2008 WL 2437770, at *3 (E.D.N.Y. June 17, 2008).

In Taylor, the court held that the ALJ erred in failing to re-contact the treating source for clarification of the treating source's opinion. Id. The ALJ gave little weight to the opinion of the treating physician, finding that objective clinical evidence in the record did not support the treating physician's conclusion that plaintiff was "totally disabled." Id. Similarly, in this case, the ALJ failed to re-contact Dr. Heredia. Here, the ALJ found Dr. Heredia's letter stating that Plaintiff was "totally incapacitated" to be broad and "contrary to objective medical evidence and treatment notes as a whole." (Tr. 21, 165.) Instead of seeking clarification of the letter, the ALJ relied on the opinion of state agency examining physician, Dr. Seo. Finding that there were differences between Dr. Seo's and Dr. Heredia's findings, the ALJ discounted the opinion of Dr. Heredia. While the SSA regulations did not require the ALJ to grant controlling weight to Dr. Heredia's opinion on Plaintiff's "ultimate disability status," as this matter was for the Commissioner to decide, the ALJ, nonetheless, failed in his affirmative duty to re-contact Dr. Heredia to obtain clarification as to his opinion. 20 C.F.R. § 404.1512(e). Aside from a "follow-up" letter from the Office of Disability Assistance Division of Disability Determinations requesting evidence for Plaintiff's claim, there is no indication in the record that the ALJ sought further information from Dr. Heredia regarding this matter. (Tr. 90.) Further, the "follow-up" letter was dated August 17, 2004, two years prior to Plaintiff's hearing before the ALJ. (Id.) Considering this time gap, it is not clear whether the "follow-up" letter was in reference to Dr. Heredia's undated letter and the record does not indicate whether the two are related. The ALJ's decision does not state whether Dr. Heredia was non-compliant in responding, nor does the record indicate that the ALJ requested additional information from Dr. Heredia regarding his letter. (Id. at 165.) The ALJ does note that Plaintiff received a letter from the state agency, reporting her noncompliance; however, neither the letter nor the ALJ's decision explicitly

19

explains how and in which regard Plaintiff was non-compliant. (Id. at 152.) Based on these ambiguities in the record, the court cannot determine whether the ALJ re-contacted Dr. Heredia as he was required to do. 20 C.F.R § 404.1512(e).

The fifth gap regards the ALJ's failure to investigate Plaintiff's claim of a "calcaneal spur," a condition that was documented in Plaintiff's medical record. Plaintiff's record exhibited several indications of her possible foot impairment. First, she listed Dr. Carlos Silva as her "foot doctor" and she provided his contact information on her list of treating sources. (Id. at 65.) Second, Plaintiff underwent a foot x-ray in May 2004, which revealed the presence of a "calcaneal spur." (Id. at 88.) Third, the notes of state agency physician Dr. Seo's indicated that Plaintiff had informed Dr. Seo of being treated with injection therapy for a heel spur. (Id. at 82.) Dr. Seo noted during the examination that Plaintiff endured right heel pain and had difficulty performing toe-to-toe and heel-to-heel walking. (Id.) The record gives no indication that the ALJ "scrupulously or conscientiously" probed into this injury or obtained records from Plaintiff's treating physician regarding this injury.

For the previously mentioned reasons, this court finds that the ALJ erred in failing to develop a complete record prior to determining Plaintiff's disability status.

**B.     The ALJ's Failure to Explain the Weight Accorded to the Medical Evidence**

Generally, the Commissioner awards more weight to Plaintiff's treating sources, "since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations." 20 C.F.R. § 404.1527(d)(2); see Schisler, 3 F.3d at 568-69. Where the treating source's opinion

is "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and is consistent with other evidence in the case record, the opinion will be given "controlling weight." Id. § 404.1527. Where the ALJ finds it appropriate to discount the treating source's opinion, he or she is required to "provide a claimant reasons when rejecting a treating source's opinion." Schisler, 3 F.3d at 568. Where the ALJ does not provide a good reason for discounting the opinion of the treating source, there is ground for remand. Snell v. Apfel, 177 F.3d 128, 133 (2d Cir. 1999).

This court finds that, in addition to failing to adequately develop the records from Bleuler, where Plaintiff received treatment, the ALJ also erred in failing to provide the grounds for discounting the report from Bleuler. The ALJ failed to give any reasons for not relying on the Bleuler report, relying instead on the opinions of the state agency psychiatrist and psychologist, Dr. Burstein and Dr. King, to conclude that Plaintiff's impairment involving depression had only a "slight or minimal effect on her ability to perform basic work activities." (Id. at 18.) Dr. Burstein reported that Plaintiff's depression was "related to bereavement condition, which is noted to generally be a temporary condition." (Id. at 18, 136.) Dr. Burstein reported that Plaintiff's mental RFC indicated that Plaintiff could adapt to simple changes and Plaintiff was not significantly limited in her ability to "complete a normal workday and workweek without interruptions from psychologically based symptoms." (Tr. 135.) Additionally, the ALJ relied on Dr. King's findings that Plaintiff did not have a history of psychiatric problems and that her condition was one of mild grief disorder, which did not inhibit Plaintiff's ability to satisfactorily "understand, carry out and remember instructions, and to satisfactorily respond appropriately to supervision, co-workers and work pressures in a work setting." (Id. at 18, 79-80.) These findings differed to some degree from those of the Bleuler

report, which stated that Plaintiff stopped working because she lacked motivation and felt unable to go on with life as before, that she could function socially but was without motivation to work, that she could not follow a work schedule because of depression, that she had "no desire to leave her home unless it was essential," and that she had "difficulty dealing with changes and schedules." (Id. at 128, 130-2.) According to the Bleuler report, Plaintiff could not work because of psychological factors – her depression and bereavement, while the state agency reports provide opinions to the contrary. (Id. at 128, 130-132, 135.)

The ALJ was required to give the opinion of the treating source controlling weight, since it came from the source "most able to provide a detailed, longitudinal picture of [claimant's] medical impairment(s)." 20 C.F.R. § 404.1527(d)(2); see Schisler, 3 F.3d at 568-569. If the ALJ found the opinions of the treating source and consulting sources contradictory, then he was required to state that, and to provide an explanation for discounting the treating source. 20 C.F.R. § 404.1527. He did not do so here. On remand, once the ALJ develops the record with respect to Plaintiff's treatment at the Bleuler center, if he decides not to give the treating source controlling weight, he must provide reasons for doing so.

## VI. CONCLUSION

For the reasons set forth above, the Commissioner's Motion is denied, and Plaintiff's Motions is granted to the extent that the decision of the Commissioner is vacated and the case is remanded to the ALJ for further proceedings in accordance with this Memorandum and Order. The Clerk of the Court is directed to close this case.

SO ORDERED.

/s/ NGG
Dated: Brooklyn, New York        NICHOLAS G. GARAUFIS
        July 30, 2009             United States District Judge

22